UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SUZANNE BRANCIFORTE,

    Petitioner,

v.

ADRIAN HERNANDEZ,

    Respondent.

Civ. No.: 04-10640 RGS

**VERIFIED AMENDED PETITION FOR: (1) RETURN OF CHILD UNDER THE HAGUE CONVENTION ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION (THE "HAGUE CONVENTION") AND THE INTERNATIONAL CHILD ABDUCTION REMEDIES ACT ("ICARA"), (2) IMMEDIATE REASONABLE ACCESS TO THE CHILD UNDER THE HAGUE CONVENTION AND ICARA, (3) A STAY OF STATE COURT PROCEEDINGS UNTIL RESOLUTION OF THIS ACTION, AND (4) VACATION OF STATE COURT CUSTODY DECREES**

As and for her Verified Amended Petition (the "Petition") in this matter, Petitioner Suzanne Branciforte ("Suzanne") states and alleges as follows:

**Preliminary Statement**

1. Notwithstanding her victories in the Supreme Court of Italy and the Juvenile Court of Genoa, Suzanne has been prevented from exercising parental rights over her ten-year old son Maximillian ("Max") for approximately five (5) years. On or about April 1, 1999, Max's father, Respondent Adrian Hernandez ("Hernandez"), removed Max from Italy under a defective and subsequently invalidated court order. Since that time, Hernandez and his Massachusetts attorney have engaged in unlawful and outrageous efforts to intimidate Suzanne into custody and financial concessions regarding Max. Perhaps most offensive, Hernandez has now terminated even the telephonic access that Suzanne and Max had enjoyed with each other during the past five (5) years.

2. Since in or about October 1998, the Worcester Probate and Family Court has erroneously exercised jurisdiction over custody issues related to Max and, in particular, penalized Suzanne for preserving her rights under the Hague Convention and the laws of Italy.

3. Under the Hague Convention and ICARA (42 U.S.C. §11601, *et seq.*), Suzanne is entitled to immediate personal access to Max, a stay of state court proceedings, an Order of this Court vacating defective state court custody-related orders entered against her contrary to the Hague Convention, and the return of Max to her in Italy, consistent with the decisions of the Supreme Court of Italy and the Juvenile Court of Genoa.

4. The Hague Convention has been in effect since on or about October 25, 1980, and has been in effect between the United States and Italy since on or about May 1, 1995. The Hague Convention, as implanted by ICARA, guarantees the prompt return of children to the country that was the place of their habitual residence when they were initially removed or retained from a custodial parent. The Hague Convention also guarantees rights of access to parents when their children have been brought to foreign countries.

## Jurisdiction

5. This Court has jurisdiction pursuant to 42 U.S.C. § 11603 (1995) and because this case involves the wrongful removal and/or retention of a child under the age of sixteen from his habitual residence in Italy. Prior state court custody-related decisions do not preclude this Court from adjudicating all relevant issues under the Hague Convention.[1]

---

[1] *See Holder v. Holder*, 305 F.3d 854, 865 (9th Cir. 2002) ("Thus, federal courts must have the power to vacate state custody determinations and other state court orders that contravene the treaty. It clearly follows that, if a prior state court custody order cannot bar a federal court from vacating the state court order, then it cannot bar federal adjudication of the Hague Convention claim.")(citation omitted).

2

## Habitual Residence in Italy by June 1998

6.     Petitioner Suzanne and Respondent Hernandez (the "Parents") are the parents of Max, who was born on September 22, 1993. The Parents spent several years together in Italy during their marriage.

7.     On or about August 5, 1997, the Parents entered into a written stipulation for interim orders related to their divorce, custody and visitation matters (the "Stipulation"). The stipulation began by stating that "[t]he parties shall have joint legal custody of the minor child" and that "[t]he wife shall have physical custody of the minor child."

8.     Paragraph 3 of the Stipulation authorized Suzanne to remove Max from the United States and to take him with her to Italy, and set a schedule of time that the child would be with each parent during several subsequent months. Paragraph 4 provided certain additional rights to Suzanne regarding access to Max while he is in the United States. Paragraph 5 provided Hernandez with visitation rights from July 24, 1998 through August 31, 1998 in the United States, contemplating a return of Max to his mother in Italy at the start of September 1998. Paragraph 6 provided visitation rights for Hernandez during school breaks. Paragraph 6A provided Hernandez with rights to telephonic access twice each week while the child resided with his mother Suzanne in Italy.

9.     The Stipulation did not place any limitation on Suzanne's right to remain in Italy indefinitely with Max. Pursuant to the Stipulation, Suzanne and Hernandez agreed to negotiate further visitation for Hernandez in good faith after August 1998.

10.    On or about October 16, 1997, Suzanne and Hernandez entered into a formal divorce agreement that incorporated their August 5, 1997, stipulations. Although the agreement was, by its terms, to be construed under Massachusetts law, Section VI expressly empowered the

3

parties to enforce it "in any court with jurisdiction over the person or property of the other party." The divorce decree expressly identified Suzanne as a resident of Italy.

11. By in or about June 1998, Max had resided primarily with his mother Suzanne in Italy for a period of more than six (6) months, attending school there on a regular and permanent basis. Suzanne had complied with the Stipulation. Hernandez had visited Max in Italy as late as in or about April 1998. Also, Hernandez had regularly placed and received telephone calls to and from Max in Italy. By in or about June 1998, Max's place of habitual residence had become Italy. Hernandez became subject to the jurisdiction of courts in Italy over custody-related matters pertaining to Max.

### Competing Jurisdictions

12. Beginning by on or about July 22, 1998, Hernandez filed a series of *ex parte* applications in Massachusetts and/or filed pleadings in Massachusetts without providing adequate notice to Suzanne.

13. Suzanne relied on counsel in Italy who advised her not to appear personally in a Massachusetts court because it could result in a submission to jurisdiction. The Massachusetts probate court conducted a trial and made findings against Suzanne *in absentia*. The Massachusetts court made a shift in custody and other determinations in favor of Hernandez, and found Suzanne in contempt for remaining in Italy. These determinations were affirmed on appeal.

14. While she did not personally appear in Massachusetts, Suzanne had been represented by Massachusetts counsel who raised and maintained objections to jurisdiction over the matter in Massachusetts, while Suzanne and Max physically resided in Italy. The state trial and appellate court effectively held Suzanne's absence from proceedings against her and

4

expressly stated that it was not addressing issues under the Hague Convention. *Hernandez v. Branciforte*, 55 Mass. App. Ct. 212, 215 & fn. 1 (2002).

15. On or about October 8, 1998, Suzanne had obtained an interim custody determination in her favor in the Juvenile Court of Genoa.

16. In or about November 1998, Hernandez filed a Hague Convention petition in the Juvenile Court of Genoa. He relied in part on orders he received *ex parte* in Massachusetts, or otherwise without Suzanne's presence, including at least one order that shifted custody to Hernandez at least in part as a discovery sanction.

## WRONGFUL REMOVAL AND/OR RETENTION OF MAX IN THE UNITED STATES

17. On or about April 1, 1999, Hernandez returned to the United States with Max pursuant to a defective order that the Supreme Court of Italy ultimately reversed on March 28, 2000. The removal of Max from Italy violated Suzanne's legal custody rights and therefore constituted a wrongful removal within the meaning of the Hague Convention.

18. At the time of the wrongful removal, Suzanne had been exercising legal and physical custody rights as to Max within the meaning of Articles Three and Five of the Convention.

19. On or about April 27, 1999, the Worcester Probate and Family Court entered Findings of Fact and Conclusions of Law ("Worcester Findings") finding Suzanne in contempt, essentially for failing to submit to the jurisdiction of the Court and for failing to return Max to the United States. Among other errors, the Worcester Findings penalized Suzanne for preserving her rights under the Hague Convention and the laws of Italy, and also fundamentally misconstrued the distinction between "removals" and "retentions."

20. Contrary to the Worcester Findings, it cannot be disputed that Hernandez originally consented to Suzanne's *removal* of Max to Italy with Court approval. The genuine issue relevant to the present proceeding that has been contested by the parties is whether at some time after July 1998, Suzanne engaged in a wrongful *retention* of Max in Italy, or whether Max's habitual residence, within the meaning of the Hague Convention, had become Italy by that time.

21. Appeals ensued in both the United States and Italy.

22. On or about March 28, 2000, the Supreme Court of Italy reversed the decision by the Juvenile Court of Genoa that returned Max to the United States. Suzanne provided immediate and prompt written notice of the March 28, 2000 judgment of the Supreme Court of Italy to Hernandez and his Massachusetts counsel. Hernandez's refusal to return Max to Italy at such time constituted a wrongful retention of him within the meaning of the Hague Convention.

23. Subsequently, the Juvenile Court of Genoa issued an order summarizing this chronology of events and dismissing Hernandez's Hague Convention petition in Italy. A copy of this order is attached hereto as Exhibit A. Suzanne provided prompt and immediate notice of this order to Hernandez and his Massachusetts counsel.

24. Hernandez's refusal to return Max to Italy at such time and through the present constitutes a wrongful retention of Max, in violation of Suzanne's custody rights, within the meaning of the Hague Convention. Suzanne's request for return has been processed through the Central Authority for the United States under the Hague Convention, namely, the National Center for Missing and Exploited Children. Suzanne is entitled under the Hague Convention to a prompt return of Max to Italy.

25. Any custody-related orders regarding Max that have been issued by state courts in the Commonwealth since in or about June 1998 have been invalid as inconsistent with the Hague

Convention. In particular, the Worcester Probate and Family Court violated international law by penalizing Suzanne for preserving her rights under the Hague Convention and the laws of Italy by remaining in Italy.

26. Under Article 17 of the Hague Convention, the custody-related orders and findings by Massachusetts courts, do not have a preclusive effect on this Court in an action under the Hague Convention. *See Holder v. Holder*, 305 F.3d 854, 865 (9th Cir. 2002). Likewise, it would be an abuse of discretion for this Court to abstain in favor of any state court proceeding. *Id.* A petitioner has a right to preserve Hague Convention claims for federal proceedings separate from family court actions. *Id.*

### Outrageous Conduct Toward Suzanne

27. Rather than return Max to Italy as lawfully required after the issuance of the decree by the Supreme Court of Italy, Hernandez and his Massachusetts counsel engaged in a series of *ex parte* and/or *in absentia* efforts in Massachusetts, in *Hernandez v. Branciforte*, Docket No. 95DR2156DVI (Mass. Super. Ct., Worcester Cty. Probate & Family Court Dep't), designed to block Suzanne from exercising her custody rights. Any order that has been issued by the Massachusetts state court has been invalid as inconsistent with the Hague Convention.

28. In addition to obtaining defective orders designed to interfere with Suzanne's relationship with her son Max, Hernandez and his counsel repeatedly threatened Suzanne with civil and criminal contempt sanctions. On multiple occasions, Hernandez informed Suzanne that she would be arrested and jailed if she were to enter Massachusetts. Hernandez and his Massachusetts counsel then conditioned Suzanne's access to Max on her willingness to submit to the jurisdiction of the Massachusetts court that had already acted *ex parte* and/or *in absentia* against her, contrary to rulings of the courts in Italy.

29. Hernandez and his counsel continue to ignore the determination by the Supreme Court of Italy and subsequent decision of the Juvenile Court of Genoa in Suzanne's favor, dismissing Hernandez's claim that Suzanne had abducted Max by keeping him there. Rather, Hernandez and his counsel erroneously refer to Suzanne's efforts in the courts of Italy as a "kidnapping," while making various threats to her regarding the penalties they will seek, and have sought *ex parte* and/or *in absentia*, for her successful efforts in the courts of Italy.

30. For one modest example, an email from Hernandez's counsel to Suzanne dated December 7, 2001, reflects an effort to threaten and control her into a realization that she would have to accept whatever terms they demanded if she ever wanted to see her son Max again. The email from Hernandez's counsel to Suzanne stated the following:

> This is to confirm my receipt of your "Motions", on Tuesday, December 4, 2001. As you might have guessed, they will be vigorously opposed, both as to law and fact. Copies of my Oppositions will be served to you in due course, by E-mail. If that is unsatisfactory to you, then you can go see the Judge about it.
>
> And just so we can be very clear about my procedural position, I will oppose any effort on your part to seek relief by telephone. Your performance on the day after Thanksgiving, as exemplary of your attitude and disrespect for the law, will never again happen, if I have to go to the Supreme Court to prevent it, an exercise you will likely never have the pleasure of watching.
>
> As for your ghost writer, you might want to tell her that she places herself at serious risk of losing her license by doing what she has done for you, particularly if she is not licensed to practice in Massachusetts. Haven't you created enough havoc for the lawyers who have courageously tried to represent you, despite the fact that you disrespect them as much as you do the court and the legal system?
>
> <u>You will not see your son until you see Judge Ricci.</u> Adrian did not make that happen. You did. You and only you, are responsible for your 31 month absence from Max's life. You cannot hide behind a mythical fear of arrest any more than your pathetic invocation of 911 as a reason for not flying here,

8

demeaning those who had spent so much time experiencing real fear when they lurched toward death in their winged missles (sic). You are just as much a terrorist as the insane fliers of those planes. In some real ways you are a worse threat to your son. Most of the The (sic) WTC victims of 911, died instantly, without knowing or having to live and cope with the cause. Your torment of your child, by kidnapping him, by having him watch your anticipated arrest of his father on trumped up charges you knew were untrue, by your holding him against the will of his dad and the entire court system of this State, all pales when compared with the 31 months of unkept promises, teasing him about seeing you and tormenting him about returning to Italy, and then refusing to see him.

And instead of reflecting on how you could get to see Max, on how you could help Adrian with Max's support, how you could rid yourself of the penalties, and orders and Judgment, all you can do is come back with more lies, more unsupported allegations as you push more and more damning papers before the court, ieach (sic) line of which shows gross disregard for Max, as you whine about you.

Everything written in your motions is either a lie, or inaccurate but, in all events, reveals the clearest picture to date that you know nothing about Max or his best interests, and even less of your own. Nothing you have written could possibly be in Max's best interests because after 31 months, you have learned nothing from trials in 2 nations and appeals to 4 courts, all of which you have lost so far. For Judge Ricci to place Max with you, under the circumstances you present, without your appearance and acknowledgment that what you have done was wrong and harmful to your son, would require her to ignore the incredibly strong evidence that you are actually harmful to your son and surely being with you even under supervision, could not be in his best interests.

I'm not a psychologist but I do know this. Your narcissistic personality, emotional lability (sic), and total disregard for everyone who gets in your way or who merely says 'no' to some outlandish scheme you continually hatch, have blinded you to reality and warped your view of everything from how to be a caring mother, who places her child ahead of her own needs, to your disingenuous forays into the two worlds of law on both sides of the Atlantic, and then picking from each as if they provided you with menus that afford you with choices.

Your twisted view of reality has been too long allowed to invade Max's, (sic) thriving, happy and peaceful life. Max's life is now

fully drawn. He is surrounded by a family who loves him so very much and by more friends than he has ever had. You continue to show your unflinching, unwillingness to let your son be the happy kid he is, [when he doesn't have to use regressive baby talk to please you, and doesn't resort to acting in order to cope with your unkept promises, your monumental selfishness and your unwillingness to honor your duties to him]. You continue to take advantage of Adrian's unwillingness to engage in conflict and thereby abuse Adrian of his generosity of spirit, his caring about you long past the point where you deserved any consideration from him, just because he was mindful that you were this boy's mother for a few years; (sic) You continue to flout every Order and Judgment issued by Judge Ricci. And all of this, coupled with your meanness, your unwillingness to keep your promises to your son, while you blatantly lie to a judge of your fear to fly to Massachusetts but your willingness to fly to Florida, all of this will now change everything.

Adrian has, until now, held sway to his view that as mother, you should be allowed to have unlimited contact. It is now clear even to your former husband, that you will not stop your tactics and abuse and that his way does not work. Providing you with unlimited calls and begging you to see Max, has not produced one grain of understanding and real love for the boy. So, now, Adrian has accepted my advice, to save his son from your hurtful and intentional behaviour. As of your receipt of this letter, that unfettered access has ended. And it will not be resumed without an Order from Judge Ricci. And if I haven't provided you with sufficient reasons above this line, then hear the next one very clearly:

You don't have a right to speak to your son when your words are shrapnel in his heart!

Beginning today, December 7, 2001, this is what will take place:

1. You will be allowed to speak with Max twice a week, <u>provided</u> you e-mail a schedule to Adrian, in advance, so he will know when you will call. Any call made at any other time, will be terminated.

2. Your calls to Max will be <u>strictly</u> monitored.

3. At the first sign of a remark that sounds like another promise you have refused to perform in the past, like seeing Max, the call will be terminated. At the first attempt to manipulate him

10

emotionally, the call will be terminated. If you then do it a second time, that call will also be terminated and you will not be able to speak to him again, until you appear before Judge Ricci, in accordance with whatever Rules of Domestic Relations Procedure apply to the rest of us.

4. Your calls will be limited to 5 minutes, <u>provided you remain appropriate</u>. If your call is ended by Adrian, do not call back. The phone will be hung up. You will not be allowed to speak to him until your next, scheduled, bi-weekly call.

5. If you return to the United States, you are not to attempt any contact with the child, in person, by telephone, or email. You are not to tell him you are in the USA if you do come and decide to call. You will not see him, unless and until Judge Ricci sets the conditions, dates, times, places and manner of supervision. Your previous kidnapping will never happen again.

6. You will not be seeing Max this Christmas. Plans have been in place for some time. They are none of you (sic) business, except to know that he will be with the family that loves him and who has sacrificed a lot more than you have done in his name and for his benefit.

Your time to furnish what you were ordered to do, is soon expiring. I urge you to get legible records to me as soon as possible. And, please keep in mind you are required to have all documents in Italian, translated into English, this time by someone who is fluent in both languages.

31. In a letter dated February 26, 2004, Hernandez's Massachusetts counsel informed Suzanne that the Worcester Division of the Probate and Family Court had proceeded *ex parte* with proceedings against Suzanne, and entered a restraining order against her and Houghton Mifflin Company preventing the release of any royalties owed to her. The letter also stated that Hernandez would be proceeding with further contempt claims against Suzanne. Although the letter claimed that service was being made "under the provisions of the Massachusetts Long Arm Statute," it was sent by registered mail and FedEx, without any indication of an attempt to

11

comply with the legal standards, under the Hague Convention for Service Abroad of Judicial or Extrajudicial Documents, for the service of process in Italy.

### Recent Events

32. In or about March 2004, Hernandez terminated telephonic access between Suzanne and Max.

33. The National Center for Missing and Exploited Children (the "NCMEC") is charged with the responsibility of acting as the Central Authority for the United States in relation to incoming Hague Convention petitions. In that capacity, the NCMEC attempts to secure counsel in the United States for foreign left-behind parents. In or about late March 2004, the NCMEC identified present undersigned counsel for Suzanne to represent her in this Hague Convention proceeding.

34. This Court "[I]n furtherance of the objectives of . . . the Convention . . . may take or cause to be taken measures under Federal or State law, as appropriate, to protect the well-being of the child involved or to prevent the further removal or concealment before the final disposition of the petition." 42 U.S.C. § 11604 (1995).

## Prayer for Relief

WHEREFORE, based on the foregoing, Petitioner respectfully demands that this Court grant her Verified Amended Petition and enter judgment in favor of Suzanne as follows: (1) requiring that Hernandez provide Suzanne with immediate reasonable access to Max, (2) staying any further proceedings in state probate court, in *Hernandez v. Branciforte*, Docket No. 95DR2156DVI (Mass. Super. Ct., Worcester Cty. Probate & Family Court Dep't) ("Worcester Action"), until the resolution of this matter, (3) vacating all custody-related orders issued in the Worcester Action since July 22, 1998, (4) requiring the return of Max to Italy, (5) awarding, under ICARA, attorneys' fees and costs that she has incurred in her efforts to recover Max, and (6) such other and further relief as may be just and fair under the circumstances.

Respectfully submitted,

By: _____
Barry S. Pollack (BBO#642064)
DONNELLY, CONROY & GELHAAR, LLP
One Beacon Street
Boston, MA 02108
(617) 720-2880
Attorneys for Petitioner

Dated: May 19, 2004

## VERIFICATION

I have reviewed the attached Verified Petition and hereby declare that it is true and accurate to the best of my knowledge, subject to the pains and penalties of perjury.

*Suzanne Branciforte*
Suzanne Branciforte

## CERTIFICATE OF SERVICE

I hereby certify that I have caused the foregoing Amended Verified Petition to be served on all counsel of record, including Edwin Hamada, Esq., for Respondent Adrian Hernandez, this 19th day of May, 2004.

_____
Barry S. Pollack